IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

ANNIE FRANCIS BRADLEY, *et al.,*      )
                                      )
      Plaintiffs,                    )
                                      )
v.                                    )          CASE NO. 2:03-cv-97-WKW
                                      )
OFFICER CHRISTOPHER WEST,             )
                                      )
      Defendant.                     )

## MEMORANDUM OPINION AND ORDER

Plaintiffs Henry Lee Hinson, as administrator of the estate of Annie Mae Hinson, deceased, and Annie Francis Bradley ("Plaintiffs") bring this civil rights action against Officer Christopher West ("Officer West") alleging violations of their constitutional rights guaranteed by the Fourth Amendment to the Constitution of the United States. This action is presently before the court on Officer West's Motion for Summary Judgment (Doc. # 52). For the reasons that follow, the court concludes the motion is due to be granted.

## I. PROCEDURAL HISTORY

West earlier moved to dismiss the amended complaint for failure of the Plaintiffs to meet the heightened pleading standard for section 1983 cases and on the basis of qualified immunity. The court found the pleading sufficient for the claims that survived, and rejected the claim of qualified immunity at that early stage of the proceedings.[1] The motion for summary judgment requires the

---

[1] For purposes of the Memorandum Opinion and Order (Doc. # 43) issued on May 16, 2006, at the motion to dismiss stage, the allegations of the amended complaint were assumed to be true, and the facts were recited as such. Discovery did not in many significant respects yield the same material facts as alleged in the amended complaint. The recital of facts in this opinion reflect those before the court at the summary judgment stage.

court to revisit the defense of qualified immunity and to test the sufficiency of the warrant giving rise

to the search of the home of Ms. Hinson.

## II. FACTS

### A. *The Search*

This action stems from events which occurred during the execution of a search warrant at the

home of Ms. Hinson on November 9, 2001, at around 8:30 a.m.  Officer West led several members

of the Second Judicial Circuit Drug Task Force ("task force") to the Hinson home in search of drugs

and drug paraphernalia.  The officers encountered two males outside the home, which required at

least one of the officers to remain outside the home to watch the males.  The remaining officers

entered the unlocked front door of the home with weapons drawn, announcing the raid.  In the home

were three females, Ms. Hinson and her two adult daughters, Annie Frances Bradley and Lillie

Seawright, all of whom were located in Ms. Hinson's bedroom at the beginning of the search and

detention and for its duration.  Taking the testimony in the light most favorable to the Plaintiffs,

Officer West handcuffed the three women during what turned out to be a two to three hour search

of the house.[2]  No narcotics were found in the search, and no criminal charges resulted from the

episode.

Mrs. Hinson was fifty-seven years old, suffered from asthma, emphysema, and diabetes, and

had dialysis three times per week.  She had a permanent dialysis draft near the base of her bicep,

which had been in her arm for over two years.  It was the seventh such draft since she began dialysis

---

[2] Deputy Vernessa Thickland ("Deputy Thickland") and Officer Gene Hutson ("Officer Hutson") testified
that Deputy Thickland, not Officer West, handcuffed Ms. Bradley and Ms. Seawright, and that Ms. Hinson was
never handcuffed. (Hutson Dep. 49-51; Thickland Dep. 30-34.)  Officer West testified that he "couldn't remember
one way or another" who handcuffed the women.  (West Dep. 111:9-10.)  Time estimates vary widely, with
Defendant's witnesses generally placing the length of the search at thirty to forty-five minutes.

in 1997.  She was not bedridden and could get up and move around.  Ms. Bradley was thirty one years old, severely obese, and suffering from emphysema requiring oxygen.  On the morning in question, she had oxygen tubes in her nose.  However, she slept with a Constant Positive Air Pressure machine which did not have oxygen attached to it.  She lived in a house behind Ms. Hinson, and cooked, did laundry and other chores, and bathed her mother daily.  The third person detained in the search, Ms.Seawright, had lived in the house approximately 10 years and was the target of the drug raid.  She is not a party to this action.  Seawright was taken to a bathroom at the beginning of the search and searched by Deputy Thickland, a female deputy on the task force. Deputy Thickland remained with the three women throughout the duration of the search.  (Thickland Dep. 30-34.)

It is undisputed that the women were handcuffed in front of their bodies.  Plaintiffs claim that Ms. Hinson's dialysis draft was damaged in the handcuffing process, and that Ms. Bradley suffered oxygen deprivation when her oxygen tubes fell from her nose during the handcuffing.  However, neither woman sought medical attention for alleged injuries suffered during the search.  Ms. Hinson was scheduled for dialysis the day after the search, and it was determined at that appointment that her dialysis draft was clogged.  It was unclogged for that treatment but subsequently had to be replaced.  There is no medical evidence that the clog and replacement were caused by any action or inaction of Officer West.  Though it is common knowledge that an interruption in dialysis can have deadly results for the patient, there is no evidence or claim that Ms. Hinson's dialysis schedule was interrupted by alleged injuries suffered at the hands of Officer West, nor is there evidence to support the allegation in the amended complaint that Ms. Hinson had to have "life-saving surgery" due to the alleged injuries inflicted by Officer West.  In fact, the only available medical evidence suggests that Ms. Hinson had a long history of clots and other troubles with her dialysis drafts.  Ms. Bradley

also did not seek medical attention before her next scheduled appointment, after which there was no indication of any complaint or injury arising out of the handcuffing or the alleged lack of oxygen during the search.

**B.**     *The Warrant*

Officer West obtained information from a confidential informant, Robert Mason, Jr. ("CI" or "Mason") that Seawright was selling drugs out of her home, which was also the home of her mother, Ms. Hinson.  This information was consistent with other information developed by law enforcement officers on the street.[3]  Officer Kevin Mitchell ("Officer Mitchell") chose Mason to make a controlled buy from Ms. Seawright in Ms. Hinson's home.  On November 6, 2001, the CI was searched for drugs, "wired" for sound,  given thirty dollars, and sent into the home of Seawright and Hinson under the observation of Officer Mitchell.  The CI returned with ten dollars and a substance that was later determined to be crack cocaine.  Mason reported to Officer Mitchell that he had purchased the crack cocaine from Ms. Seawright while he was in Ms. Hinson's home.  Officer West obtained a warrant from Lowndes County District Court Judge Terri Bozeman based upon his sworn testimony as follows:

> That within the past 48 hours a reliable confidential source who has proven reliable in the past and whose information has led to numerous arrest [sic] and conviction [sic] did make a purchase of (crack) cocaine from Lillie Mae Bradley  at 403 Old Calhoun Road in Fort Deposit[,] Alabama, 36032.  Informant further advised that more crack was present at the residence at the time of purchase which was seen by him or her . . . .

(West Aff.)  While he considered Mason to be trustworthy and reliable, Officer West was unable to recall specific instances of assistance by Mason when asked about it at his deposition.  Officer

---

[3] For instance, Officer Hutson testified "that's pretty much common knowledge" on the street that Ms. Seawright was dealing drugs. (Hutson Dep. 20:20-21.)

Mitchell, who was not deposed, provided an affidavit stating that Mason had provided information that led to approximately ten arrests and five convictions. (Mitchell Aff. ¶ 3.)  Jimmy Lee Duke, another member of the task force, also testified by affidavit that Mason had provided reliable information leading to a number of drug arrests and convictions.  (Duke Aff. ¶ 18.)

### III.  JURISDICTION AND VENUE

The court exercises has subject matter jurisdiction over this action pursuant 28 U.S.C. §§ 1331, 1343, and 1367.  The parties do not contest personal jurisdiction or venue, and the court finds adequate allegations in support of both.

### IV.  SUMMARY JUDGMENT STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id*. at 323.  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id*. at 322-23.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories,

and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"

*Id*. at 324.  To avoid summary judgment, the nonmoving party "must do more than simply show that

there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 586 (1986).  On the other hand, a court ruling on a motion for summary

judgment must believe the evidence of the non-movant and must draw all justifiable inferences from

the evidence in the non-moving party's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255

(1986).  After the nonmoving party has responded to the motion for summary judgment, the court

must grant summary judgment if there is no genuine issue of material fact and the moving party is

entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

## V.  DISCUSSION

Plaintiffs have claims for an unreasonable search due to a lack of probable cause to issue the

warrant, and excessive force in the execution of the warrant.  West claims entitlement to qualified

immunity on both claims, for which he seeks summary judgment.  The validity of the warrant will

be addressed first, with the discussion of qualified immunity following.

**A.**     ***Search Warrant***

The Fourth Amendment secures the right of the people against unreasonable searches and

seizures and requires probable cause for the issuance of warrants:

> The right of the people to be secure in their persons, houses, papers, and effects,
> against unreasonable searches and seizures, shall not be violated, and no warrants
> shall issue but upon probable cause, supported by oath or affirmation, and
> particularly describing the place to be searched, and the persons or things to be
> seized.

 U.S. Const. amend. IV.  A warrant issued without probable cause is invalid, and a search conducted

under an invalid warrant is presumptively unreasonable.  *See Groh v. Ramirez,* 540 U.S. 551, 557-59

(2004). "[P]robable cause is a fluid concept – turning on the assessment of probabilities in particular factual contexts – not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983).  Probable cause "exists when the totality of the circumstances allow a conclusion that there is a fair probability of finding contraband or evidence at a particular location." *United States v. Brundidge*, 170 F.3d 1350, 1352 (11th Cir. 1999).   The affidavit in support of a warrant "must contain sufficient information to conclude that a fair probability existed that seizable evidence would be found in the place sought to be searched." *United States v. Martin*, 297 F.3d 1308, 1314 (11th Cir. 2002)(internal quotation marks and citation omitted).  There is "a presumption of validity with respect to the affidavit supporting the search warrant." *Franks v. Delaware*, 438 U.S. 154, 171 (1978).  That presumption may be overcome with a substantial showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was sworn to by the affiant in support of the warrant.  *Id.* at 155-56.

In light of the constitutional mandate, the warrant here is facially valid.  It is supported by oath, and it particularly describes the place to be searched and the things to be seized.  It recites a minimum factual basis for probable cause, based upon information from a reliable confidential informant, sufficient to conclude that a fair probability exists that seizable evidence was located at the Hinson residence.  *See Brundidge,* 170 F.3d at 1352.  In coming to this conclusion, the court has considered the brevity of the affidavit in support of the warrant and Eleventh Circuit authority on the subject.  *See id.*; *United States v. Jackson,* No. 06-11651, 2007 WL 245774, at *4 (11th Cir. Jan. 30, 2007).  The warrant arose out of a single drug buy in a personal residence.  There is ample evidence that the CI was reliable.  Officer Mitchell and Officer Hutson's affidavits detailing the number of cases made with the assistance of Mason are uncontradicted, as is the testimony of Officer West.

The controlled buy was as trustworthy as possible without actual video footage or personal participation in the transaction by the officers.  It is undisputed that (1) Mason was searched before the buy; (2) that he was observed entering and exiting the house occupied by Ms. Hinson and Ms. Seawright: (3) that he went in with thirty dollars and came out with ten; (4) that he reported he bought a substance from Ms. Seawright and that there was more in the house, and (5) that the substance Mason returned with was crack cocaine.  Plaintiffs have not provided substantial evidence that the informant was unreliable. Under the totality of the circumstances, the court finds the warrant supported by probable cause.

Plaintiffs challenge the warrant on three grounds.  First, the warrant admittedly names Seawright by her maiden name, Lillie Mae Bradley.  Plaintiffs do not contest West's contention that Lillie Mae Bradley and Lillie Mae Seawright are one and the same person.  Plaintiffs insist that this information is unreliable, however, because the *drug buy sheet* identifies "Lillie Rudolph, alias Lula Mae" as the source of the buy.  (Pl. Ex. 11.)  Plaintiff has supplied no authority for analysis of the effect of a drug buy sheet which contradicts the affidavit in support of the warrant, and the court has found none. The contradiction on the drug buy sheet does not establish substantial  evidence of falsity and ill motive or recklessness on the part of Officer West.  Because Plaintiffs have not shown by substantial evidence, as they must, that the name on the affidavit was false and supplied knowingly and intentionally or in reckless disregard for the truth, this challenge fails. *See Franks*, 438 U.S. at 155-56.

Plaintiffs' second challenge to the affidavit in support of the warrant is also related to the drug buy sheet.  The contention is that no address appears on the drug buy sheet, merely the intersection of two streets.  Because there is more than one house at that intersection, the Plaintiffs

challenge the reliability of the affidavit. Plaintiffs conflate the drug buy sheet with the affidavit. It is undisputed that the affidavit contains the proper address of the Hinson home where Seawright had resided for over ten years. There is no allegation that this information in the affidavit is wrong, much less tainted with substantial evidence of knowing and intentional falsity or reckless disregard for the truth as required by the *Franks* analysis. This challenge likewise fails.

Finally, plaintiffs question Officer West's motives for using "supporting evidence" of a charge of "distribution of a controlled substance" when he really intended to charge Seawright with possession only. (Pl. Br. 17.) Assuming this contention is true – and, having read the exhibit and deposition testimony, the court is not convinced that it is – Plaintiffs' argument continues to be deficient under *Franks*. There is no showing of false information in the warrant, much less a substantial showing that false information was provided intentionally.

Because there is no dispute of material fact with respect to the validity of the warrant, there is no constitutional violation and West is entitled to summary judgment on the unlawful search claim.

**B.      *Excessive Force***

"In addressing an excessive force claim brought under section 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." *Graham v. Connor*, 490 U.S. 386, 394 (1989). All claims that law enforcement officers have used excessive force during the seizure of a free citizen are analyzed under the reasonableness standard of the Fourth Amendment. *Id.* at 394-95. Determining whether the force used "is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental

interests at stake." *Id.* at 396 (internal quotation marks and citations omitted).  The inquiry is an

objective one, "judged from the perspective of a reasonable officer on the scene, rather than with the

20/20 vision of hindsight." *Id.* at 396-97.  Careful attention to the facts and circumstances of the

particular situation are required, and the following factors are relevant under *Graham*: (1) severity

of the crime; (2) whether the suspect poses an immediate threat to the safety of the officers or others;

and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight.  *Id.*

at 396.

Qualified immunity shields law enforcement officials from liability for excessive force

claims in certain circumstances.  Qualified immunity applies when the official is performing

discretionary functions if their conduct violates no "clearly established statutory or constitutional

rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818

(1982).  This compels the examination of case law applying the doctrine to concrete circumstances.

"If case law, in factual terms, has not staked out a bright line, qualified immunity almost always

protects the defendant." *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1557 (11th Cir. 1993).

"An officer's authority to detain incident to a search is categorical; it does not depend on the

'quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure.'"

*Muehler v. Mena*, 544 U.S. 93, 98 (2005) (quoting *Michigan v. Summers*, 452 U.S. 692, 705 n.19

(1981)).  This includes the use of reasonable force to effectuate the detention. *Id.* at 98-99.  The

imposition of correctly applied handcuffs to effectuate detention during a search is, in appropriate

circumstances, a reasonable application of force.  *Id.* at 99.  However, the duration of the use of

handcuffs can affect the balance of interests under *Graham* and must be weighed under a

reasonableness analysis. *Id.* at 100; *see also Maryland v. Wilson,* 519 U.S. 408, 414 (1997) (noting

that the need to detain multiple persons made the use of handcuffs all the more reasonable); *Summers*, 452 U.S. at 702-03 (recognizing the execution of a warrant to search for drugs is an inherently dangerous situation which "may give rise to sudden violence or frantic efforts to conceal or destroy evidence" and that the risk of harm to officers and occupants "is minimized if the officers routinely exercise unquestioned command of the situation").

In the Eleventh Circuit, there is another important consideration in excessive force cases: "[T]he application of de minimis force, without more, will not support a claim for excessive force in violation of the Fourth Amendment." *Nolin v. Isbell*, 207 F.3d 1253, 1257 (11th Cir. 2000). This principle applies to a minimal amount of force *and* minimal injury: " . . . a minimal amount of force and injury . . . will not defeat an officer's qualified immunity in an excessive force case." *Id.* at 1258. Discussing *Jones v. City of Dothan*, 121 F.3d 1456, 1460-61 (11th Cir. 1997), the *Nolin* court observed that while the use of force against the plaintiff in *Jones* may have been unnecessary, "the actual force used and the injury inflicted were both minor in nature. Given such variables, the application of the excessive force standard would not inevitably lead an official in the defendant officer's position to conclude that the force was unlawful." *Id.* at 1256-57. In summary, minimal force and injury will *not* defeat qualified immunity; *unnecessary* force which is minimal and inflicts only minor injury will not *inevitably* defeat qualified immunity.

Applying these principles first to the amount and duration of force used against the Plaintiffs, the court finds the application of the handcuffs to be both a reasonable and minimal use of force under the circumstances. As to reasonableness, the second *Graham* factor concerning threats to the safety of officers and others is paramount. Officer Thickland testified that the handcuffing was necessary to protect not only the officers but the detainees: "I told them at that time it was for their

own safety, as well as mine." (Thickland Dep. 29:22-23.)  In an inherently dangerous setting, handcuffs are a reasonable restraint.  *Summers*, 452 U.S. at 702-03; *Muehler*, 544 U.S. at 100.  The detainees were cuffed in front with a female officer in attendance for all but a short time (i.e., during the search of the person of Ms. Seawright).  Moreover, there were several persons in the house when the task force entered.  In order for the task force to maintain numerical superiority and absolute control of the situation, handcuffing allowed the availability of the maximum number of searchers while the occupants were being watched by one deputy, which presumably resulted in a quicker search.  While some discomfort and inconvenience are inevitable in any use of handcuffs, their use was reasonable and does not rise to a constitutional violation under the facts of this case.

The duration of the handcuffing was likewise reasonable under the circumstances.  Plaintiffs testified to varying lengths of time, with two to three hours being the maximum length of the detention and search.  In *Muehler*, the Supreme Court specifically rejected the claim of the plaintiff that being handcuffed two to three hours during the execution of a search warrant at a personal residence was unreasonable.  *Muehler*, 544 U.S. at 100.  The Court wrote that "the 2- to 3- hour detention in handcuffs in this case does not outweigh the government's continuing safety interests. . . .  We conclude that the detention of Mena in handcuffs during the search was reasonable."  *Id.* Plaintiffs argue that the rural setting, age and infirmity of the detainees, and nature of the search (i.e., search for drugs) distinguishes *Muehler* from the facts of this case.  In *Muehler,* the search was for gang weapons and paraphernalia.  However, under the reasoning of *Summers* with respect to the inherently dangerous nature of drug searches, and considering the number of detainees present in or on the premises, Plaintiffs' *Muehler* distinction fails.  Officer West has given ample explanation for the need for handcuffs during the search in this case.

Finally, and for all the reasons stated above, the court finds the use of handcuffs in this case to be the minimal force necessary to effectuate the safety of the officers and the occupants during the search.  The use of force, in the form of handcuffs was reasonable in view of the governmental interests at stake.

Not only was the use of handcuffs reasonable and minimally intrusive under the circumstances of this case, but Plaintiffs failed to produce evidence of physical injuries exceeding the Eleventh Circuit de minimis standard as stated in *Nolin*.  Neither plaintiff produced competent medical evidence of injuries suffered in the detention.  Neither sought immediate medical care.  Ms. Bradley's claim that she was "required to undergo two (2) separate emergency operations to save her life" (Am. Compl. ¶ 13) due to the destruction of her dialysis draft by Officer West is wholly unsupported by medical testimony.  The following passage from Ms. Bradley's deposition is particularly telling:

> Q.    After the police officer left you said you laid down?
> A.    Yes.
> Q.    You put your oxygen tube back on and laid down?
> A.    Yes.
> Q.    What did your mother do?
> A.    She was still sitting in the chair when I laid down.
> Q.    Okay.  And Lillie, what did she do?
> A.    I can't know.  I fell asleep.   I went to sleep.
> Q.    You went to sleep?
> A.    Yes.
> Q.    All right.  How long would you say you were asleep?
> A.    About an hour.
> Q.    What did you do after you woke up?
> A.    I get up.  My mom asked me was I okay.  I said, "yes, I will be all right."
>       And I said, "are you okay?"  She said, "yeah, but my wrist is sore.  They hurt
>       . . . ."

(Bradley Dep. 85:4-24.) Viewing all the circumstances in the light most favorable to Plaintiffs, there

is insufficient evidence of physical injury to Ms. Hinson and Ms. Bradley to support a constitutional

violation under controlling Eleventh Circuit precedent. The use of force was not clearly excessive.

Officer West is entitled to qualified immunity on the excessive force claim.[4]

## V.  CONCLUSION

For the foregoing reasons, it is ORDERED that the Motion for Summary Judgment

(Doc. # 52) is GRANTED.  All claims against the defendant are DISMISSED, and summary

judgment will be entered in favor of Defendant as to all claims.

DONE this the 22nd day of March, 2007.

      /s/  W.  Keith Watkins
      UNITED STATES DISTRICT JUDGE

---

[4] Assuming *arguendo* a constitutional violation, Officer West would be entitled to qualified immunity under the clearly established violation analysis. This is not an obvious clarity case. Accordingly, Plaintiffs would have to show the existence of a factually similar case with a "bright line" establishing the clear precedent. *See Post,* 7 F.3d at 1557. Because Plaintiffs have not produced such a case, and the court has found none, Officer West would be entitled to qualified immunity under the full three pronged analysis.